[L.A. No. 31612. Dec. 13, 1982.]

In re ELISE K., a Minor.
LOS ANGELES COUNTY DEPARTMENT OF ADOPTIONS,
Petitioner and Respondent, v.
SANDRA K., Objector and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Janice L. Feinstein, Deputy State Public Defender, for Objector and Appellant.

Robert Burns as Amicus Curiae on behalf of Objector and Appellant.

John H. Larson, County Counsel, and Lester J. Tolnai, Deputy County Counsel, for Petitioner and Respondent.

OPINION

THE COURT.*—(1)  Appellant, Sandra K., appeals from a judgment entered pursuant to Civil Code section 232, subdivision (a)(7), which terminated her custody and control over her daughter Elise.

While the appeal was pending in the Court of Appeal, Elise's adoptive placement had to be terminated, and she was returned to foster care. It is now conceded by both parties to the appeal that Elise is no longer adoptable due to her age. The parties sought to bring evidence of these postjudgment circumstances to the attention of the Court of Appeal. However, that court declined to give weight to the evidence.

Subsequently, this court granted appellant's petition for hearing to determine whether evidence of such postjudgment changes of circumstances may be considered by an appellate court. The parties have now offered a stipulation, requesting that the judgment herein be reversed and the cause remanded to the trial court for further proceedings "in light of subsequent material evidence concerning the adoptability of the subject minor."

This court has determined that it is appropriate to accept that stipulation. Accordingly, the judgment of the superior court in this case is reversed.

**BIRD, C. J.,** Concurring.—When unusual new circumstances are brought to the attention of an appellate court in the course of a parent's appeal from a judgment declaring a child to be free from the parent's custody and control (Civ. Code, § 232[1]), should the appellate court consider the changed circumstances,

---

*Before Bird, C. J., Mosk, J., Richardson, J., Broussard, J., Reynoso, J., Carr, J.,† and Sparks, J.†

[1] All statutory references hereafter are to the Civil Code unless expressly provided otherwise.

†Assigned by the Chairperson of the Judicial Council.

or is its consideration of the appeal limited to the evidence which was available to the superior court rendering the judgment? As I shall explain, an appellate court should consider this limited type of postjudgment evidence. Therefore, I concur in the court's decision to reverse the judgment in this case.

## I.

On November 9, 1977, the Los Angeles County Department of Adoptions (Department) filed in the superior court a petition pursuant to section 232, seeking to free Elise K. from her parents' custody and control. Insofar as is relevant to this appeal,[2] the petition alleged that Elise was a person defined by subdivision (a)(7) of section 232, i.e., that she was a minor who had been in foster home placement for two or more years, that her return to a parent would be detrimental, and that the parents had failed and were likely to fail in the future to provide her with a home, care, control, and an adequate parental relationship.[3]

To prevail on the petition, the Department had to establish by clear and convincing evidence[4] not only that the elements of subdivision (a)(7) were true but also that returning the child to the parent's custody and control would be harm-

---

[2] The petition also alleged that custody and control should be terminated because Elise was an abandoned child (§ 232, subd. (a)(1)) and had been cruelly treated or neglected (§ 232, subd. (a)(2)). These allegations were dismissed as to Elise's mother, appellant herein. See *post*, footnote 11.

Elise's father did not contest the petition and consented to her adoption.

[3] At that time, section 232 provided in pertinent part:

"(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from custody and control of either or both of his parents when such person comes within any of the following descriptions:

". . . . . . . . . . . . . . . . . . . .

"(7) Who has been cared for in one or more foster homes under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to

"(i) Provide a home for said child;

"(ii) Provide care and control for the child;

"(iii) Maintain an adequate parental relationship with the child; and

"(iv) Maintain continuous contact with the child, unless unable to do so.

"Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."

Subparagraph (iv) of subdivision (a)(7) was deleted by the 1977 Legislature. (Stats. 1977, ch. 1252, § 75, p. 4315, operative July 1, 1978.) Recently, the Legislature reduced the two-year foster care period to one year and added new paragraphs at the end of subdivision (a)(7). (Sen. Bill No. 14 (1982 Reg. Sess.) Stats. 1982, ch. 978, § 1, approved by Gov., Sept. 12, 1982, filed with Sect. of State, Sept. 13, 1982, eff. immediately as urgency measure.) Other minor or irrelevant modifications to these provisions of section 232 have been made as well. (See *ibid.*; Stats. 1979, ch. 245, § 1, p. 534.)

[4] *In re Angelia P.,* (1981) 28 Cal.3d 908, 915-922 [171 Cal.Rptr. 637, 623 P.2d 198].

ful to the child[5] and that termination of the relationship was the least detrimental of the alternatives available for the child.[6]

Hearings on the petition were held on several days throughout the first eight months of 1978. The history chronicled below was brought out at those hearings.

Appellant (Sandra K.) married at the age of 18 in 1961. The marriage produced two children, a son, Michael, born in December of 1961 and a daughter, Elise, born in February of 1968. Only Elise is the subject of the current proceedings.

In 1970, it was discovered that appellant, who was then 27 years old, was suffering from a rare incurable disease called intercranial fibrous dysplasia. As a result of the disease, a tumor covered most of the base of her brain and extended into her nasal and sinus cavities. In November of 1970 and again in March of 1972, appellant underwent lengthy decompressive surgery to remove the tumor. In the interval between these operations, she had two nasal operations.

A portion of the tumor was located in a delicate area of the brain so total removal proved impossible. As a result, appellant's prognosis was considered to be poor. Medical evidence was produced which indicated that the tumor could reactivate at any time and if it did it usually caused a rapid death. After the decompressive surgery, appellant's life expectancy was estimated to be two to five years. However, the tumor has remained dormant.

Nevertheless, appellant's vision has been impaired by the disease and she may not drive a car. She is prone to seizures, headaches, and nasal congestion, and takes medication for these problems. "Normal" illnesses can be life-threatening. While one social worker testified appellant's health might cause her "some difficulty in holding down a job," both appellant and the other witnesses who testified on the point agreed she was physically capable of performing housework and "parenting" her daughter.

In March of 1973, appellant and her husband separated, the children remaining with appellant in San Diego. Neighbors' complaints of inadequate supervi-

---

[5]*In re B. G.* (1974) 11 Cal.3d 679, 696-699 [114 Cal.Rptr. 444, 523 P.2d 244] [to deprive a parent of custody of a child, a finding is required that the award of custody to the parent would be detrimental to the child]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 495-496 [146 Cal.Rptr. 623, 579 P.2d 514] [requirements of *In re B. G., supra,* applied to section 232 proceedings]. See also *In re Angelia P., supra,* 28 Cal.3d at page 925.

[6]*In re Carmaleta B., supra,* 21 Cal.3d at page 489; *In re Angelia P., supra,* 28 Cal.3d at page 923; *In re David B.* (1979) 91 Cal.App.3d 184, 198 [154 Cal.Rptr. 63]. See *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 707-709 [117 Cal.Rptr. 856, 84 A.L.R.3d 654].

sion over Elise and an unsanitary home led to three police contacts in the next four months. By the end of August 1973, both children had been declared dependent children of the juvenile court. (Former Welf. & Inst. Code, § 600, subds. (a) and (b).) Elise was then five years old. She was placed in a foster home and has not returned to live with appellant.

Subsequently, appellant moved into her parents' home in Van Nuys. The children were transferred to a foster home nearby in Reseda. In April of 1974, however, those placements were terminated, and the children were moved to separate foster homes in Saugus. In August, Elise's foster home placement was again changed, this time to the Kenney home in La Canada. Elise remained there through termination of the section 232 proceedings below.

In mid-1974, appellant moved with her son, Michael, into an apartment of her own. A man (Gary) stayed at the apartment for two weeks, and later another man (Joe) moved in. Joe cohabited with appellant until early 1975. A county dependency supervision worker, Valerie McIlroy, reported "friction" between Michael and Joe; Michael felt ignored by appellant and blamed Joe. McIlroy arranged for appellant to attend therapy, but her attendance was poor and the therapy was terminated. In January of 1975, Michael was placed in a foster home. Shortly thereafter, financial problems caused appellant to move back with her parents. She stayed there until the spring, when she moved into her own apartment.

Meanwhile, Michael was having "difficulties" at his foster home and had developed a serious case of ankylosing spondylitis, or juvenile arthritis. In July of 1975, Michael was placed with his grandparents (appellant's parents).[7]

By mid-fall 1975, McIlroy, the dependency worker, had decided to refer Elise's case to the Department of Adoptions. She felt that Elise needed a long-term, stable home and that despite McIlroy's best efforts, appellant "had not been able to demonstrate her ability to provide this." McIlroy perceived appellant as "a mother who really loved her children but who did not appear to have the capacity to follow through with her very good intentions."

By the beginning of 1976, appellant had returned to her parents' home. Her subsequent plan to move into an apartment had to be abandoned in order to take care of Michael. His arthritis had caused his leg to swell and he was forced to leave school. In addition, appellant's estranged husband had begun divorce proceedings, and her social security income was cut off when he would not provide information concerning his past alimony payments. By the end of September

---

[7]Michael has remained in the grandparents' home. McIlroy attempted to place Elise there, too, but the grandmother felt she could not care for both children.

1976, appellant was "in a pretty bad emotional state," according to Louise MacKay, her social worker from the Department.

In mid-November, appellant and MacKay agreed to a "deadline": "if by the 1st of April [1977] [appellant] hadn't succeeded in establishing herself in a home, . . . she would consent to adoption" of Elise. Appellant's social security benefits had been restored, along with a back payment of $1,600, which she used to pay her bills and to retrieve her furniture from storage. Appellant indicated she could not let Elise get away and would settle down and "be a housekeeper."

In February of 1977, appellant moved into an apartment. However, it was an adults-only apartment, and she lived there with her elderly grandfather.

Meanwhile, Elise's social worker had begun exploring the idea of adoption with Elise. Elise indicated that more than anything she wanted to be a part of a family. She wanted to be adopted, and she also wanted to continue seeing her mother after the adoption.

In March, appellant's divorce became final. Her Navy medical benefits were cut off, including coverage for her frequent visits to the Navy doctor in San Diego who had been treating her dysplasia since the decompressive surgery.[8] Her social security income was reduced. At the end of the month, the Department decided it would file a section 232 petition so as to permit Elise's adoption into a stable family. Appellant was informed of the Deparment's decision by a phone call from MacKay. Thereafter, the Department lost direct contact with her. MacKay testified appellant had previously indicated that "if she lost Elise, she would run away."

According to MacKay, appellant disappeared for several weeks, leaving her mother to pay the rent at her apartment and relocate the grandfather. In early May, appellant's mother informed MacKay that appellant was returning to the apartment. In August, a new address for appellant was provided. And in late September, appellant "disappeared" again. Appellant testified she went to Las Vegas with "someone I shouldn't have gone with" and "ended up being stranded" there for three months. She met a man to whom she became engaged and returned to her parents' home on December 22.[9] The Department's section 232 petition had been filed a month earlier.

The hearings on the petition produced considerable, uncontradicted evidence of a lasting affectionate relationship between appellant and Elise. A children's services worker's report observed that "Elise seemed to have very strong ties

[8]Appellant resisted transfer to a university clinic nearer her home.
[9]In August 1978, appellant called off the engagement.

with her mother [but] recently . . . began to request a permanent, long-term family. The minor Elise has been greatly disappointed by infrequent visitation with her natural family. . . . Elise wishes to remain in contact with her mother." The testimony of several social workers at the hearings confirmed the "affection," the "strong relationship, the ties," and the "warmth" existing between mother and daughter.[10]

The Department viewed the situation as "very difficult." On the one hand, Elise was 10 years old and in need of a stable, permanent family with whom she could live. Appellant was viewed as incapable of providing such an environment. On the other hand, it was recognized that it would be detrimental to Elise to completely sever her ties with her mother.

The Department proposed to have Elise adopted by a family that would permit continued contact with appellant. As the trial court noted—and all parties agreed—there was "no doubt the child is adoptable." Indeed, the Department had found a family that was willing and qualified to adopt Elise on that basis. The wife in this family was a substitute teacher at Elise's school.

It was recognized, however, that Elise was approaching a "turning point" in terms of adoptability, because of her age. As one social worker testified, "It is either now or never." The attorney appointed to represent Elise cautioned that "time is flying."

In December of 1978, the court announced its intended decision to sustain the section 232 petition.[11] The court found that "the social workers made many attempts to reunite Elise with her mother, but each time the [mother's] plans to have suitable housing or to take the child back never materialized. . . . For the past four years the mother has exhibited erratic and irresponsible behavior . . . ."[12]

The court specifically observed that Elise, "now age 10, has expressed love and sympathy for her mother, but no desire to live with her. She has a strong desire to have permanent parents after five years in foster homes. Elise will need a stable home and parents who are themselves emotionally secure."

[10]It is worth noting that the trial court permitted appellant and Elise to visit biweekly, between court hearings.

[11]The court dismissed the allegation of abandonment as to appellant, ruling that appellant "has never intended to abandon Elise, and that her visits have been more than token." It also dismissed the allegation of cruel treatment or neglect "due to remoteness, since the incidents happened in 1973."

The court entered findings against Elise's father under both subdivisions (a)(1) and (a)(7). The court found that he had "failed to communicate with the minor in any manner" since his separation from appellant.

[12]The court mentioned appellant's "disappearing for days at a time," "changing housing arrangements every few months," and her "refusal to accept counselling and therapy."

The Department quickly moved to place Elise with the family seeking to adopt her. At the same time, the court ordered that appellant be permitted bimonthly visits with Elise pending a final adoption decree.[13] Noting "the relationship that has existed between the child and her mother," the court opined that "[w]e cannot block out the past family."[14]

In March of 1979, the court entered its judgment in accordance with its intended decision. This appeal ensued.

While the appeal was pending before the Court of Appeal—after full briefing but prior to oral argument—appellant sought to bring some new information to that court's attention. According to a children's services worker's report filed in the superior court in September of 1981, Elise "was experiencing problems in her adoptive home." As a result, the Department had indicated that Elise would be removed from this home and placed in a foster home, "pending [a] new plan for the minor."

On January 6, 1982, the Department wrote to the Court of Appeal and confirmed that Elise had been removed from the adoptive placement and returned to a foster home. The Department added that for the first time in two years, appellant had requested visits with Elise and that three visits had been arranged following Elise's return to a foster home. The letter concluded, "It has always been the position of the Department of Adoptions that the current situation of children whose freeing actions are on appeal is significant and should be considered by the reviewing Court."

At oral argument, both sides urged the Court of Appeal to consider the postjudgment situation. Apparently, the Department told the court that Elise's age—then nearly 14 years old—made her no longer adoptable. Thus, Elise was without a family or the prospect of a family.

In April of 1982, the Court of Appeal filed its decision and affirmed the judgment of the superior court. The court's decision alluded to the postjudgment information in a footnote but found it irrelevant to "whether the elements of Civil Code section 232, subdivision (a)(7), have been established . . . ."

## II.

The proceedings authorized under section 232 are one part of a comprehensive scheme by which the state asserts its strong interest in the welfare of

---

[13]See *In re Marriage of O'Connell* (1978) 80 Cal.App.3d 849, 858-859 [146 Cal.Rptr. 26]; see also *Adoption of Pierce* (1970) 5 Cal.App.3d 316 [85 Cal.Rptr. 104].

[14]The court also was concerned about the "probability" that its judgment freeing Elise "can be reversed" on appeal.

children. As was noted in *In re B.G., supra,* 11 Cal.3d at page 696, "California has at least eight separate proceedings in which [child] custody questions can be litigated." The preeminent focus of this scheme is "the welfare and best interests of a child." (See § 232.6; see also, e.g., §§ 227; 4600, subd. (b).)

The termination of parental rights contemplated by section 232 is the ultimate sanction envisioned by the Legislature. It represents the total and irrevocable severance of the bond between parent and child. (§§ 232.6, 238.) The child's emotional relationships with his or her natural parent and siblings are cut off. Any right to parental support or to an inheritance from biological family members is terminated. The parents, in turn, lose the right to the companionship, care, and custody—and the possibility of ever regaining visitation rights or custody—of their offspring.

The "fundamental interests" which are at stake are "ranked among the most basic of civil rights . . . ." (*In re Carmaleta B., supra,* 21 Cal.3d at p. 492; *In re B.G., supra,* 11 Cal.3d at p. 688.) Consequently, the parent-child relationship may be terminated under section 232 "only in exteme cases of persons acting in a fashion incompatible with parenthood." (*In re Carmaleta B., supra,* 21 Cal.3d at p. 489.)

Other provisions of statutory law permit a child to be taken from the custody of a deficient parent without extinguishing the parent-child relationship or terminating all parental rights. (See especially Welf. & Inst. Code, § 300.) Thus, resort to section 232 proceedings is generally inappropriate unless, inter alia, the state intends—and is reasonably likely—to provide the child with a satisfactory long-term replacement for the otherwise permanent parental relationship that is being terminated. In short, a termination of parental rights is normally appropriate only when adoption is realistically contemplated.[15]

Case law, legislative history, and statutory law all confirm this obvious conclusion. The courts of this state have long recognized that the "purpose of [a section 232 action] is to facilitate adoption of the minor child." (*In re Marriage of O'Connell, supra,* 80 Cal.App.3d at p. 854.[16]) Indeed, the statutory provi-

---

[15]The Legislature has made abundantly clear that foster care is not a satisfactory long-term solution. "It is the policy of the Legislature that foster care should be a temporary method of care for the children of this state, that children have a right to a normal home life, that reunification with the natural parent or parents or another alternate permanent living situation such as adoption or guardianship are more suitable to a child's well-being than is foster care, and that this state has a responsibility to attempt to ensure that children are given the chance to have a happy and healthy life, and that, to the extent possible, the current practice of moving children receiving foster care services from one foster home to another until they reach the age of majority should be discontinued." (Welf. & Inst. Code, § 396.)

[16]See also, e.g., *In re David B.* (1979) 91 Cal.App.3d 184, 196 [154 Cal.Rptr. 63]; *In re Shannon W.* (1977) 69 Cal.App.3d 956, 962 [138 Cal.Rptr. 432]; *In re Eugene W.* (1972) 29 Cal.App.3d 623, 629 [105 Cal.Rptr. 736].

sions regarding the termination of parental rights were originally transferred from the Juvenile Court Law to the Civil Code for precisely this reason: "What is contemplated by court action under [the Juvenile Court Law predecessor to section 232] is not continuing guidance and supervision by a governmental agency, but freeing the child for adoption by a private person. This is essentially an adoption problem and, therefore, should be handled by the civil court handling adoptions." (Governor's Special Study Com. on Juvenile Justice, pt. I (1960) p. 23. See also *In re Jacqueline H.* (1978) 21 Cal.3d 170, 174, fn. 1 [145 Cal.Rptr. 548, 577 P.2d 683].)

In 1980, the Legislature once again made this point with unmistakable clarity. It enacted section 232.6, which provides in pertinent part that "[t]he purpose of this chapter [dealing with the termination of parental rights] is to serve the welfare and best interests of a child *by providing the stability and security of an adoptive home* when those conditions are otherwise missing from his or her life." (Italics added.)[17]

Finally, the essential role of adoptability was recently underscored by the enactment of Welfare and Institutions Code section 366.25. (Sen. Bill No. 14, *ante,* fn. 3, Stats. 1982, ch. 978, § 27.) This section deals with the disposition by the juvenile court of children—like Elise and virtually all children on whose behalf proceedings are brought under subdivision (a)(7)—who have been determined to be dependent children of the court (Welf. & Inst. Code, § 300).

The pertinent provisions of the new law apply when a dependent child cannot be returned home and there is no "substantial probability" of such a return within six months. (Welf. & Inst. Code, § 366.25 [hereafter, § 366.25], subd. (d).) Under these circumstances, the juvenile court shall order the initiation of section 232 proceedings if "the minor is adoptable." (§ 366.25, subd. (d)(1).) If, however, "the court finds that the minor is not adoptable," it orders the initiation of legal guardianship proceedings. (*Id.,* subd. (d)(2).) Or, if there is no suitable adult available to become legal guardian, then some other plan is worked out for placement "in a home environment that can reasonably be expected to be stable and permanent." (*Id.,* subd. (d)(3).)

Thus, a section 300 finding only entitles the juvenile court to order section 232 proceedings *if the minor is adoptable.* Even then, it has specified three situations in which termination proceedings are inappropriate even as to

---

[17]"The Legislature [also] stated the purpose behind section 232 proceedings when it added section 232.9 to the Civil Code. 'It is the intention of the Legislature in enacting this act to extend adoption services for the benefit of children residing in foster homes at public expense by facilitating legal actions required for adoption *so that these children may be placed in adoptive homes where they will have the benefits of stability and security.'*" (*In re David B., supra,* 91 Cal.App.3d at p. 195, quoting Stats. 1970, ch. 583, § 1, p. 1160; italics added in *David B.*)

adoptable minors who are dependent children.[18] In addition, the statutory scheme indicates that termination proceedings are *not* appropriate if the outlook for the dependent child is for something short of adoption, i.e., legal guardianship or long-term foster care. Thus, adoptability has once again been revealed to be of critical concern to the Legislature in the area of termination of parental rights.

The critical role of adoption in a section 232 proceeding was recognized by the participants at the superior court hearings in the present case. The Department produced substantial evidence that Elise was adoptable, and the trial court flatly stated that it had "no doubt" about that fact. Subsequently, in its decision on the merits, the court focused on Elise's desire for "permanent parents" and her need for "a stable home and *parents* who are themselves emotionally secure." (Italics added.)

While at the time of the section 232 proceedings the outlook for adoption was exceedingly favorable, subsequent events have, unfortunately, drastically altered that picture. Elise's adoptive placement has been terminated,[19] and she has been returned to foster care. The Department no longer considers Elise to be adoptable, due to her age.[20] Thus, Elise is now in the position of having neither a parent nor a prospect of gaining one through adoption.

Elise has had a long and caring—if incomplete—relationship with her natural mother. This is a relationship which both parties wish to continue. "[T]he importance to a child of continuity of parental relationships" cannot be understated. (See *Adoption of Michelle T., supra,* 44 Cal.App.3d at p. 706.) Under these circumstances, had the trial court been able to foresee that Elise would not be adopted, it surely would not, and could not, have ordered appellant's parental rights terminated. No established legislative purpose would have been

---

[18]One such situation occurs when the "parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing this relationship." (§ 366.25, subd. (d)(1)(A).) Further, section 232 proceedings are not authorized when the "minor 12 years of age or older objects to termination of parental rights." (*Id.,* subd. (d)(1)(B).) And finally section 232 proceedings are not authorized if "exceptional circumstances" prevent the minor's foster parents from adopting the minor *and* the removal of the minor from the home of the foster parents would be "seriously detrimental" to the minor. (*Id.,* subd. (d)(1)(C).)

[19]We do not know the nature of the problems Elise experienced in her adoptive home which caused her return to foster care. However, it is apparent that those problems were not attributable to any interference by appellant, since the Department's letter to the Court of Appeal indicated appellant had not visited Elise in the final two years of her adoptive placement.

[20]Elise will be 15 years old in February. It should be remembered that the testimony at Elise's section 232 hearing in 1978 was that it was "now or never" for her adoption. More than four years have elapsed since that time.

The Court of Appeal in this case believed that the evidence appellant sought to elicit on appeal merely "relat[ed]" to whether a particular family is likely to adopt Elise." But the evidence in fact shows much more than that. It indicates that since the failure of the original adoptive placement and due to Elise's age, Elise is no longer reasonably likely to be adopted by *any* family.

served by sustaining a section 232 petition in such circumstances. Except where the natural parent abuses the child—a situation not presented by this appeal—an inadequate parent would appear to be preferable to no parent at all and would be more consistent with the overall legislative scheme.[21]

The only question remaining to decide is whether this court may take cognizance of these critical postjudgment events. The general rule is that "an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration." (See *In re James V.* (1979) 90 Cal.App.3d 300, 304 [153 Cal.Rptr. 334].) This rule serves to promote speedy adjudications of fact and to avoid prolonged delays on appeal. It also reflects an "essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . ." (*Tupman* v. *Haberkern* (1929) 208 Cal. 256, 262-263 [280 P.2d 970].)

This general rule is not absolute, however. Section 909 of the Code of Civil Procedure (hereafter, section 909) permits appellate courts, "[i]n all cases where trial by jury is not a matter of right or where trial by jury has been waived, [to] make factual determinations contrary to or in addition to those made by the trial court. . . . The reviewing court may for the purpose of making the factual determinations or for any other purpose in the interests of justice, *take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal,* and may give or direct the entry of any judgment or order and may make any further or other order as the case may require." (Italics added; see also Cal. Const., art. VI, § 11 ["The Legislature may permit appellate courts to take evidence and make findings of fact when jury trial is waived or not a matter of right."].)

It is true that the power conferred upon appellate courts by section 909 is to be used sparingly and has been narrowly construed. (See *People* v. *Benford* (1959) 53 Cal.2d 1, 6-7 [345 P.2d 928]; *Estate of Schluttig* (1950) 36 Cal.2d 416, 421-423 [224 P.2d 695].) However, most of the decisions limiting the use of this power involved attempts to introduce on appeal evidence which (1) existed at the time of trial, (2) was contested on appeal or was cumulative of evidence that was contradicted at trial, and (3) was not conclusive on the question for which its admission was sought. None of these problems is present

---

[21]It is not a purpose of the child custody laws to punish parents for their shortcomings. (See, inter alia, *In re Marriage of Stoker* (1977) 65 Cal.App.3d 878, 881-882 [135 Cal.Rptr. 616]; *Ashwell* v. *Ashwell* (1955) 135 Cal.App.2d 211, 217 [286 P.2d 983].)

here. Moreover, courts have been somewhat more open to admitting evidence that involved events which occurred after the judgment was entered.[22]

Moreover, the state has a substantial continuing interest in the welfare of a child, especially a child whom the state has mistakenly—it turns out—rendered parentless. The biological parent, too, has a fundamental interest in maintaining a relationship with his or her child. Together, these interests clearly outweigh the competing interests served by the general rule limiting appellate review to matters before the trial court. A narrow exception to the general rule is appropriate. Section 909 would appear to expressly provide such a vehicle. Thus, if compelling new circumstances arise which undermine the basis for a section 232 order during a parent's appeal from such an order, an appellate court may and should take cognizance of and consider those changed circumstances.[23]

Such compelling new circumstances are present here. The state took the drastic step of terminating Elise's relationship with her natural mother. This step was considered to be in Elise's best interest at that time. It was based in part on the reasonable premise that Elise could and would be provided with a more satisfactory parental relationship through adoption. For reasons unforeseeable at the time, the premise has turned out to be erroneous. Elise has

---

[22]See *People* v. *Associated Oil Co.* (1931) 211 Cal. 348 [296 P. 273] [referee appointed to take evidence concerning facts occurring subsequent to the injunction order appealed from]; *Stellman* v. *Stellman* (1953) 119 Cal.App.2d 805 [260 P.2d 209] [on wife's appeal of order refusing to annul marriage, appellate court admits postjudgment decree by out-of-state court, divorcing husband from prior wife]; *Thompson* v. *City of Los Angeles* (1947) 82 Cal.App.2d 45 [185 P.2d 393] [postjudgment evidence admitted that power line sought to be enjoined had been built and put into operation]. But see *McCracken* v. *Teets* (1953) 41 Cal.2d 648 [262 P.2d 561] [admission of postjudgment evidence denied because its accuracy contested]; *Smith* v. *Smith* (1955) 135 Cal.App.2d 100 [286 P.2d 1009] [admission of postjudgment evidence denied because not determinative].

[23]Appellant's counsel urges us to take judicial notice of the September 1981 report filed in the superior court and of the additional fact—not expressly stated therein—that Elise is no longer adoptable.

The 1981 report may be judicially noticed. (Evid. Code, § 452, subd. (d)(1).) The fact of nonadoptability is not so clearly a proper subject for judicial notice. It seems more in the nature of a concession by the Department or a stipulation between the parties than a matter to be formally judicially noticed.

Counsel appears to be arguing that our taking judicial notice would ipso facto resolve this appeal. However, as is noted in the comment to Evidence Code section 459, "Having taken judicial notice of such a matter, the reviewing court may or may not apply it in the particular case on appeal. The effect to be given to matters judicially noticed on appeal, where the question has not been raised below, depends on factors that are not evidentiary in character and are not mentioned in this code." (See Cal. Law Revision Com. com. to Evid. Code, § 459, 29B West's Evid. Code (1966 ed.) p. 423; Deering's Evid. Code (1966 ed.) pp. 542-543.)

Thus, even if this court were to take judicial notice of the matters on appeal, there would remain the question whether those matters should be considered in ruling on the merits. That question—not the propriety of judicial notice—is the issue here.

not been adopted and is no longer adoptable.[24] The basis for the section 232 order has been undermined.

"To refuse to receive appropriate evidence of such facts for [the reason that they arose after judgment] is to deliver up the court as a blind instrument for the perpetration of fraud, and to make its proceedings by such refusal the means of inflicting gross injustice." (*Dakota County* v. *Glidden* (1885) 113 U.S. 222, 226 [28 L.Ed. 981, 982, 5 S.Ct. 428].)

Based on the facts before this court, I agree with my colleagues that the judgment should be reversed.

Reynoso, J., concurred.

---

[24]It bears emphasizing that generally, the failure of one adoptive placement is unlikely to mean that a child is not adoptable. Normally, other adoptive placements may be tried and succeed. What makes the present case atypical is the fact that Elise was placed for adoption at a relatively late age and considerable time passed before her adoptive placement was deemed to be unworkable. Both parties now agree that Elise is no longer reasonably likely to be adopted.

It may also be worth clarifying that this case does not involve an attempt to present evidence that a previously recalcitrant or deficient parent has "cleaned up her act" after a section 232 petition was sustained. That issue is not before us.