19 Cal.Rptr.3d 490 (2004)
122 Cal.App.4th 235
In re MERRICK V. et al., Persons Coming Under the Juvenile Court Law.
San Diego County Health and Human Services Agency, Plaintiff and Respondent,
v.
Alice E., Defendant and Appellant.
No. D043261.
Court of Appeal, Fourth District, Division One.
September 13, 2004.
Rehearing Denied October 12, 2004.
Review Denied December 1, 2004.[*]
*494 Sharon S. Rollo, under appointment by the Court of Appeal, Chatsworth, for Defendant and Appellant.
John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Caitlin E. Rae, Deputy County Counsel, for Plaintiff and Respondent.
Christopher Blake, under appointment by the Court of Appeal, San Diego, for Minors Merrick V. and Morrigan V.
Robert Wayne Gehring, under appointment by the Court of Appeal, for Minor James V.
AARON, J.
Alice E. is the maternal grandmother and guardian of twin brothers, Merrick V. and Morrigan V. and their half brother, James V. The boys were declared dependents of the juvenile court because of neglect. Alice appeals orders (1) finding the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901, et seq.) did not apply, (2) terminating her guardianship, and (3) denying her de facto parent status. Alice also claims her trial counsel was ineffective.
We agree that the orders finding ICWA did not apply must be reversed in the twins' cases because ICWA's notice requirements were not followed; we remand to the juvenile court with directions to reconsider the issue after proper notice has been given. We reject Alice's claims pertaining to the other orders of the juvenile court and affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND
James, born in January 1991, and Merrick and Morrigan, born in December 2000, are the sons of Rebecca V., who has a long history of drug abuse and homelessness. Rebecca had a positive drug toxicology when the twins, Merrick and Morrigan, were born. On August 12, 2002, the probate department of the superior court issued letters of guardianship, naming Alice the legal guardian of James, Merrick and Morrigan.
*495 On January 19, 2003, Chula Vista police officers found two-year-old Merrick and Morrigan wandering in the street unattended, wearing nothing but dirty diapers. The officers could not locate the twins' parents and took them to Polinsky Children's Center, where they tested positive for methamphetamine and marijuana. On January 23, the San Diego County Health and Human Services Agency (Agency) filed dependency petitions on behalf of the twins, alleging (1) they were at substantial risk because of the failure of their parent or legal guardian to provide them with food, clothing and shelter, and (2) they had been left without any provision for support. (Welf. & Inst.Code, § 300, subds. (b) & (g).)[1] The petitions identified Rebecca as the person from whom the children were removed. Rebecca was listed as the twins' mother; Alice was not named in the petitions.
James had been staying at the residence of one of his mother's friends. He had insect bites on his chest from sleeping on the floor. School officials told social workers that James's attendance was inconsistent and that he was late for school four out of five days per week. James also arrived at school at odd hours, such as 5:00 a.m., and he had been seen on the roof of the cafeteria. James was taken to Polinsky Children's Center on January 31, 2003.
James told a social worker he lived with his mother and sometimes with his grandmother. Alice told a social worker that she helped care for the boys. Alice also told the social worker that when Rebecca lived with her, Rebecca used drugs and was "in and out of the home all of the time" and often slept all day long. Alice informed the social worker that she had applied for guardianship of the boys because Rebecca neglected them, but that she had not followed through with the application process.
On February 5, 2003, Agency filed a dependency petition on behalf of James, alleging he was at substantial risk because of the failure of his parent or legal guardian to provide him with food, clothing and shelter, and his siblings had been neglected. (§ 300, subds.(b) & (j).) The petition identified Rebecca as James's mother; Alice was not named in James's petition.
Alice said she had cared for the children until a week before their removal, when she returned them to Rebecca's care because she was suffering health problems. Rebecca told the social worker that on the day the twins were found wandering in the street, she had left them with a friend while she went to pick up their clothing at another friend's apartment.
On February 11, 2003, at the dispositional hearing for Merrick and Morrigan, neither Rebecca nor Alice was present. The court sustained the petitions filed on behalf of Merrick and Morrigan and placed them in a licensed foster home. Rebecca appeared at a special hearing for the twins the following month. The court ordered six months of reunification services for Rebecca.
On March 11, 2003, Rebecca appeared in court and submitted to the jurisdiction of the juvenile court as to James. Through her attorney, Rebecca informed the court that she might have some American Indian heritage, specifically the Yaqui Indian Tribe. The court determined that the ICWA did not apply, but directed Agency to send notice to the Yaqui Tribe and the Bureau of Indian Affairs (BIA). The court ordered Rebecca to enroll in the Substance Abuse Recovery Management System (SARMS), the court's drug treatment case management program, and to comply with *496 her case plan. James was placed in a licensed foster home.
On June 6, 2003, Alice wrote a letter to the court in which she expressed her concerns about James's foster home placement. In the letter, Alice stated that she was the legal guardian of James, Merrick and Morrigan. On June 10, Alice wrote another letter to the court stating that she had had custody of James for the last three years and that she had had custody of the twins since their birth. Alice said the boys were visiting their mother at the time they were picked up by authorities. Enclosed with Alice's letter was a copy of the letters of guardianship issued by the probate court, appointing Alice legal guardian of the three children effective August 12, 2002.
On June 10, 2003, at a SARMS review hearing, after having received Alice's letter and the guardianship papers, the court directed the social worker to evaluate Alice's home for placement and visitation purposes, and set a special hearing on the matter for July 1.
After conducting its investigation, Agency recommended that the three boys remain placed in their foster homes. Agency reported that Alice, who shared a two-bedroom apartment with adult friends, was on temporary disability due to stress. Alice told a social worker she had sent the children back to live with Rebecca in January 2003 because Alice was suffering from bronchitis, high blood pressure and chest pains. Since Alice had earlier told a social worker that Rebecca had a long history of drug abuse, it appeared that she had decided to return the children to Rebecca's care despite knowing Rebecca used drugs. Agency concluded that the children should not be placed with Alice because (1) she did not have suitable housing for them, (2) the twins were very active and required intensive supervision, (3) it was questionable whether Alice could care for the children in view of her health problems, and (4) Alice had returned the children to Rebecca knowing Rebecca abused drugs, thereby placing them at risk. On July 1, the court received Agency's report. The court took no action other than to direct Agency and the children's counsel to investigate whether the children's educational and medical needs were being met.
On July 18, 2003, Agency filed a request under section 728 that the juvenile court seek permission of the probate court to terminate Alice's guardianship, and also filed a section 388 motion to accomplish the termination. Agency pointed out that Alice had never provided Agency with the guardianship papers although she had had numerous contacts with social workers. Agency also recommended that the court terminate Rebecca's reunification services and set a section 366.26 hearing for all three children. The social worker reported that Rebecca had not complied with her case plan and that she was uncooperative with both SARMS and the social worker.
On August 12, 2003, the court amended the petitions to add Alice as the guardian of the children, and appointed counsel for Alice. Neither Alice nor her counsel requested reunification services.
At the end of August 2003, Rebecca was discharged from drug court because she had tested positive for marijuana and refused residential treatment.
On September 18, 2003, Alice filed a de facto parent application in which she stated that Merrick and Morrigan had lived with her since their birth, and that James had lived with her when he was between the ages of four and six, and eight and 12 years. The application also stated that Alice had provided the children with shoes, clothing, food and housing while taking care of their daily needs. Alice intended *497 the de facto parent application as a contingency in the event the court terminated her guardianship.
At the contested hearing on September 18, 2003, Alice acknowledged that she should not have returned the children to Rebecca's care when she was ill, and said she was sorry the children had suffered. Alice said she believed at the time that Rebecca was stable because she had a place to live and was involved in a job program. Alice also testified that for various reasons, including Rebecca's denials, which Alice believed, she did not have any reason to think Rebecca was using drugs. On cross-examination, Alice denied having told a social worker in January that Rebecca had a long history of drug use. Alice also denied she had told the social worker that she had requested guardianship of the children because of Rebecca's drug use. Alice testified that if she were to become sick again, she would make arrangements for her daughter-in-law to care for the children.
Rebecca testified that she had told Alice she never used drugs, and that she did not tell Alice she had tested positive for drugs when Merrick and Morrigan were born.
At the conclusion of the September 18, 2003 hearing, the court terminated Alice's guardianship of the three children and denied Alice's de facto parent application as to all of the children. The court also terminated reunification services for Rebecca and set a section 366.26 hearing in the twins' cases, but continued the hearing in James's case. Five days later, on September 23, the court terminated Rebecca's reunification services in James's case and set a section 366.26 hearing. Neither Alice nor her attorney was present at this hearing. Alice did not seek extraordinary writ relief of the termination orders in the twins' cases by filing a petition pursuant to California Rules of Court, rule 39.1B.[2]
On November 14, 2003, Alice filed a notice of appeal.
On June 8, 2004, we stayed the upcoming hearing in the twins' dependency cases.
On August 30, and September 1, 2004, we augmented the record on appeal to include materials from the superior court file regarding ICWA notices sent by Agency subsequent to the orders at issue in this appeal. (Rule 12(a); see fn. 3, post.)

II

DISCUSSION

A. Failure to Comply with the Notice Requirements of ICWA Requires Reversal and Remand

Alice contends the court erred by finding ICWA did not apply because Agency never submitted information to the court showing that the Yaqui tribe and the BIA were in fact noticed.
In 1978, Congress enacted ICWA to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families...." (25 U.S.C. § 1902.) ICWA allows a tribe to intervene in dependency proceedings because the law presumes it is in the child's best interest to retain tribal ties and heritage and that it is the tribe's interest to preserve future generations. (In re Desiree F. (2000) 83 Cal.App.4th 460, 469, 99 Cal.Rptr.2d 688.)
"[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with *498 return receipt requested, of the pending proceedings and their right of intervention." (25 U.S.C. § 1912(a).)
If the identity of the tribe cannot be determined, notice must be given to the BIA. (25 U.S.C. § 1912(a); Dwayne P. v. Superior Court (2002) 103 Cal.App.4th 247, 253, 126 Cal.Rptr.2d 639.)
Notice must be sent whenever there is reason to believe the child may be an Indian child. (Rule 1439(f)(5).) "[T]he juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement." (In re Nikki R. (2003) 106 Cal.App.4th 844, 848, 131 Cal.Rptr.2d 256.) ICWA notice requirements are strictly construed. (In re Karla C. (2003) 113 Cal.App.4th 166, 174, 6 Cal.Rptr.3d 205.)
The Indian tribe determines whether the child is an Indian child. (In re Desiree F., supra, 83 Cal.App.4th at p. 470, 99 Cal.Rptr.2d 688.) "A tribe's determination that the child is or is not a member of or eligible for membership in the tribe is conclusive." (Rule 1439(g)(1).)
The notice sent to the BIA and/or Indian tribes must contain enough information to be meaningful. (In re Karla C., supra, 113 Cal.App.4th at p. 175, 6 Cal.Rptr.3d 205.) To enable a court to review whether sufficient information was supplied, Agency must file with the court the ICWA notice, return receipts, and responses received from the BIA and tribes. (Id. at pp. 175, 178-179, 6 Cal.Rptr.3d 205.)
Agency concedes it did not submit to the court proof of notices to the tribe or to the BIA. Further, Agency acknowledges that the court's finding that ICWA did not apply cannot stand without proof of proper notice.[3]
Accordingly, we reverse the orders finding ICWA did not apply in the twins' cases and remand with directions for the court to assure compliance with ICWA's notice requirements and California case law interpreting ICWA. (See, e.g., In re Karla C., supra, 113 Cal.App.4th 166, 6 Cal. Rptr.3d 205.) In James's case, we dismiss Alice's appeal of the ICWA finding as moot. (See fn. 3, ante.)

B. The Court Did Not Err in Terminating Alice's Guardianship

Alice contends the juvenile court erred in terminating her guardianship of the *499 three boys without first providing her with reunification services.

1. Procedural Background
All court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ. (§ 366.26, subd. (l)(1); rule 39.1B; In re Anthony B. (1999) 72 Cal.App.4th 1017, 1021-1024, 85 Cal. Rptr.2d 594; In re Charmice G. (1998) 66 Cal.App.4th 659, 671, 78 Cal.Rptr.2d 212.)
In In re Charmice G., supra, 66 Cal. App.4th 659, 78 Cal.Rptr.2d 212, the Court of Appeal held section 366.26, subdivision (l) bars direct appeals from orders setting a section 366.26 hearing. The appellate court explained that its statutory interpretation is in keeping with recent legislative efforts to "expedite finality in dependency proceedings" and to achieve permanency for children in the system. (In re Charmice G., supra, 66 Cal.App.4th at p. 668, 78 Cal.Rptr.2d 212.) In In re Anthony B., supra, 72 Cal.App.4th at page 1023, 85 Cal.Rptr.2d 594, the Court of Appeal extended "the bar of section 366.26, subdivision (l) [to] all orders issued at a hearing in which a setting order is entered." The court in In re Anthony B. noted:
"The goals of expedition and finality would be compromised if the validity of these types of contemporaneous, collateral orders were permitted to be raised by appeal from the order itself or from a later permanent planning order and therefore allowed to remain undecided until well after the permanent plan was decided upon. The desired expedition and finality obviously would be most threatened when the permanent plan was adoption and termination of parental rights, the preferred plan which must be ordered if the child is found adoptable and the juvenile court cannot make any of the findings set out in section 366.26, subdivision (c)(1)(A) through (D)." (In re Anthony B., supra, 72 Cal.App.4th at p. 1023, 85 Cal. Rptr.2d 594.)
The juvenile court is required to advise parties who are present at the hearing in which the section 366.26 is set of the requirement to file a writ petition to challenge any orders made at the hearing. (§ 366.26, permanancy planning hearing subd. (l)(3)(A); rules 1435(e), 1436.5(d).) If the parties are not present at the hearing, the court is required to mail notice of the writ petition requirement to the parties within 24 hours. (Rules 1435(e), 1436.5(d).) Failure to give notice of the writ petition requirement relieves a party of the requirement. (In re Athena P. (2002) 103 Cal.App.4th 617, 625, 127 Cal. Rptr.2d 46.)
The court terminated Alice's guardianship of her three grandchildren at the September 18, 2003 hearing, at which Alice was present with counsel. Also at that hearing, the court set section 366.26 hearings, but only for the twins. Five days later, the court set the section 366.26 hearing for James; Alice was not present and was not represented by counsel at the September 23 hearing.
Regarding the September 18, 2003 hearing, the record is unclear whether Alice was advised of the writ petition requirement in accordance with section 366.26, subdivision (l)(3)(A). Although the clerk's transcript indicates that Alice was given proper notice of the writ requirement,[4] the reporter's transcript does *500 not contain any advisement by the court of the writ requirement. Further, the reporter's transcript includes the court's directive to her counsel: "You need to advise your client of her appeal rights and time frames." (Italics added.) Conflicts between the reporter's and clerk's transcripts are generally presumed to be clerical in nature and are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise. (People v. Smith (1983) 33 Cal.3d 596, 599, 189 Cal.Rptr. 862, 659 P.2d 1152; In re Maribel T. (2002) 96 Cal.App.4th 82, 86, 116 Cal.Rptr.2d 631.) We reconcile this conflict in favor of the reporter's transcript (In re Josue G. (2003) 106 Cal.App.4th 725, 731, fn. 4, 131 Cal.Rptr.2d 92) and find that Alice did not receive notice of the writ requirement in the twins' dependency cases.
In light of the failure to provide Alice with notice of the writ requirement in the twins' cases, Alice may challenge the orders made at the September 18, 2003 hearing on appeal.[5] (In re Athena P., supra, 103 Cal.App.4th at p. 625, 127 Cal.Rptr.2d 46.)
As to James's case, the order terminating Alice's guardianship was not made at the same hearing at which the order setting the section 366.26 hearing was set. Thus, Alice may properly challenge the termination order as to James by appeal.
We turn to the substantive merits of Alice's challenge.

2. The Court Proceeded Properly in Terminating Alice's Guardianship
Alice contends the juvenile court failed to distinguish between a probate court guardianship and a dependency court guardianship, and thereby violated her due process rights when it terminated her guardianship of the three boys without offering her reunification services. We disagree.
Alice's guardianship was established under Probate Code section 1500 et seq. before the dependency proceedings were initiated; she was the legal caretaker of the children when the juvenile court took jurisdiction over them. Alice correctly points out that there is a distinction between a guardianship established under the Probate Code and a guardianship established in a dependency proceeding as a result of a permanent plan. (§ 366.26, subd. (b)(3); see In re Heraclio A. (1996) 42 Cal.App.4th 569, 575-578, 49 Cal. Rptr.2d 713; In re Carrie W. (2003) 110 Cal.App.4th 746, 758, 2 Cal.Rptr.3d 38.) A guardian appointed by the probate court has greater rights than a guardian appointed under the Welfare and Institutions Code. (See In re Carrie W., supra, 110 Cal.App.4th at p. 758, 2 Cal.Rptr.3d 38 [in many respects, guardian appointed under Probate Code is entitled to be treated as a parent in dependency proceedings].) For example, a guardian appointed under the Probate Code will be entitled to (1) receive social study reports before hearings (§ 302, subd. (b)), (2) have counsel appointed if financially unable to afford to hire one (§ 317, subd. (a)), (3) object to evidence at the jurisdictional hearing (§ 355, subd. (a)), and (4) receive reunification services (§ 361.5, subd. (a)).
While the juvenile court did not explicitly distinguish a probate court guardianship from a dependency court guardianship, the court was under no obligation to state on the record that it was aware of the differences between the two types of guardianship. The record establishes that the *501 court followed the appropriate procedure to terminate Alice's probate court guardianships once Alice informed the court of her status as legal guardian of the children. Agency filed a motion to have the juvenile court inform the probate court of the pending termination, as is required under section 728 for termination of a Probate Code guardianship (§ 728, subd. (b)), and the court appointed counsel for Alice and set a hearing on the motion.

3. Alice Did Not Have a Right to Reunification Services Under the Circumstances of this Case
Section 361.5, subdivision (a) provides in pertinent part: "[W]henever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." Alice contends that the juvenile court was required under section 361.5, subdivision (a) to provide reunification services to her since she was the children's guardian at the time the dependency proceedings began. Further, Alice maintains the court erred by not considering her right to such services before it terminated her guardianship.
It is undisputed that Alice was not provided reunification services as required under section 361.5, subdivision (a) at the February 11, 2003 dispositional hearing for the twins and the March 11 dispositional hearing for James. However, the juvenile court was not aware of Alice's status as legal guardian until June, when she disclosed it in her correspondence to the court. Alice had not previously informed the court or Agency that she was the children's legal guardian even though she had ample opportunity to do so. Under these circumstances, neither the court nor Agency can be faulted for not providing Alice with reunification services at the outset of the dependency proceedings.
The question remains whether reunification services should have been provided to Alice once she had disclosed the guardianships and before the guardianships were terminated. If Alice had been appointed guardian by the juvenile court (see, e.g., § 360, subd. (a)), the court would not have been required to offer reunification services before terminating her guardianship. (In re Alicia O. (1995) 33 Cal.App.4th 176, 182, 39 Cal.Rptr.2d 119.) However, the parties have not provided, and our research has not uncovered, any authority concerning whether reunification services must be offered to the guardian before a predependency or Probate Code guardianship can be terminated under section 728.
We must resolve this question by considering the interplay between section 361.5, subdivision (a), which mandates that reunification services be provided to a guardian "whenever" (italics added) a child is removed from the guardian's custody, and section 728, subdivision (a), which authorizes the juvenile court to terminate a guardianship established under the Probate Code for a child who "is the subject of a petition filed under section 300" at any regularly scheduled dependency hearing or any subsequent time.[6]
"The fundamental rule of statutory construction is that the court should *502 ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] Moreover, `every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' [Citation.] If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. [Citation.] Such purpose will not be sacrificed to a literal construction of any part of the act." (Select Base Materials, Inc. v. Board of Equalization (1959) 51 Cal.2d 640, 645, 335 P.2d 672.)
In seeking to harmonize section 361.5, subdivision (a) and section 728, our goal is to avoid an interpretation that requires one statute to be ignored. (Fuentes v. Workers' Comp. Appeals Bd. (1976) 16 Cal.3d 1, 7, 128 Cal.Rptr. 673, 547 P.2d 449.) "`A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions. [Citations.] This rule applies although one of the statutes involved deals generally with a subject and another relates specifically to particular aspects of the subject. [Citations.]'" (In re Sarah F. (1987) 191 Cal. App.3d 398, 408-409, 236 Cal.Rptr. 480.)
In reconciling the mandatory language of section 361.5, subdivision (a) with section 728, we first consider these provisions in the context of the statutory scheme of dependency law. "Dependency proceedings are proceedings of an ongoing nature. While different hearings within the dependency process have different standards and purposes, they are part of an overall process and ongoing case. One section of the dependency law may not be considered in a vacuum. It must be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." (In re Marilyn H. (1993) 5 Cal.4th 295, 307, 19 Cal.Rptr.2d 544, 851 P.2d 826.)
Typically, a dependency case begins when a peace officer, probation officer or social worker, who has a reasonable belief that a child falls within the definitions set forth in section 300 and is in immediate danger, removes the child from the home. (§§ 305, 306.) A petition to have the child declared a dependent child must be filed within 48 hours (§ 313; rules 1440(a), 1442(b)), and a detention hearing must be held no later than the next judicial day (§ 315; rule 1442(d)). At the detention hearing, the social services agency has the burden of making a prima facie showing that the child comes within section 300 and that there is a need for detention. (§ 319, subd. (b).)
Within 15 days of the detention order, the juvenile court must set a hearing on the dependency petition, which is commonly referred to as the jurisdictional hearing. (§ 334.) At this hearing, the court determines whether the child comes within its jurisdiction by deciding whether the allegations in the petition are true. (§ 355, subd. (a).) If the court finds there is jurisdiction under section 300, it must conduct a disposition hearing. (§ 358, subd. (c); rules 1449(g), 1451, 1455.) If the court declares the child a dependent child of the juvenile court, it then considers whether the child may remain with the parent or guardian, or whether the child must be removed from the parent's or guardian's custody pursuant to section 361, subdivision (c).
Section 361.5 mandates that reunification services for parents or guardians be offered at the dispositional hearing i.e., "whenever a child is removed from a parent's or guardian's custody...." (§ 361.5, subd. (a), italics added.) It is at *503 the dispositional stage that the child is removed from the parent's or guardian's custody; prior to that point, the child is being detained. "The statutes and rules governing dependency actions clearly require that a family reunification plan be developed as part of any dispositional order removing a child from its home." (In re Dino E. (1992) 6 Cal.App.4th 1768, 1776-1777, 8 Cal.Rptr.2d 416.)
Turning to the language of section 728, we conclude that this statute gives the juvenile court the authority to terminate a Probate Code guardianship at any stage in the dependency proceeding, including at the detention hearing or the jurisdictional hearing. Section 728 becomes operative when the child "is the subject of a petition filed under Section 300 . . . ." (§ 728, subd. (a).) The court may hear a motion to terminate a Probate Code guardianship under section 728 at "any regularly scheduled hearing held in [the dependency] proceedings ... or at any subsequent hearing concerning the dependent child ...." (§ 728, subd. (a).) A child is "the subject of a petition filed under Section 300" as soon as the dependency petition is filed. (§ 728, subd. (a).)
Considered in this context, section 361.5, subdivision (a) and section 728 are not irreconcilable. Notwithstanding the mandatory language of section 361.5, subdivision (a), a predependency or Probate Code guardianship may legally be terminated before reunification services are offered to the guardian.
This case is unusual in that Alice's status as legal guardian was not initially disclosed to the court. We note that upon receiving Alice's June 10, 2003 correspondence and the letters of guardianship, the court promptly ordered Agency to investigate the possibility of placing the children with Alice. On July 1, the court received Agency's report indicating Alice could not provide a suitable placement for the children. Later that month, Agency filed a motion to terminate Alice's guardianship, which was to be held on August 12. On that date, the court amended the petitions to add Alice as guardian, and appointed counsel to represent Alice; the court continued the hearing on Agency's termination motion to allow Alice's newly appointed counsel time to familiarize herself with the case.
At that point, the initial dispositional hearings had long since passed. Five months earlier, reunification services had been offered to Rebecca and not to Alice. However, as to Alice, the posture of the case was predispositional. That is, the proceedings were still at a stage at which the court could properly grant Agency's motion to terminate Alice's guardianships under section 728 without first offering her reunification services. We note that if the court had denied Agency's termination motion, this would have set the stage for a new dispositional hearing to address reunification services for Alice.
We conclude that the court acted within its statutory authority in terminating Alice's guardianships and that Alice was not deprived of her substantive due process rights. Nor was she denied procedural due process. Alice was provided with appointed counsel and was given the opportunity to oppose Agency's termination motion. Alice has not shown how the delay in appointing counsel prejudiced her.
Finally, we reject Alice's contention that the court held Agency to the wrong standard of proofa preponderance of the evidence rather than clear and convincing evidenceon the motion to terminate her guardianships. (See In re Alicia O., supra, 33 Cal.App.4th at p. 183, 39 Cal.Rptr.2d 119.) The court did not articulate what standard it applied. Alice's *504 only support for claiming that the court applied a preponderance of evidence standard is that Agency's attorney argued that preponderance of the evidence was the correct standard. In the absence of evidence to the contrary, we presume trial court rulings are correct. (See, e.g., Winograd v. American Broadcasting Co. (1998) 68 Cal.App.4th 624, 631, 80 Cal. Rptr.2d 378.)
In any event, substantial evidence supports the court's orders terminating Alice's guardianships, under either standard. Knowing that Rebecca's lifestyle posed a risk to the children, Alice returned them to Rebecca's care when Alice was ill. As a result, the two-year-old twins were left wandering on the street in January 2003, wearing nothing but diapers. Their older brother had no place to sleep but on the floor of a friend's apartment, where he suffered numerous insect bites. He was seen at school at odd hours, such as 5:00 a.m., and also was seen on the roof of the cafeteria. In short, none of the three children was properly supervised. At trial, Alice denied any knowledge of her daughter's drug use and Rebecca backed up Alice's testimony. The court, sitting as trier of fact, did not believe their testimony. We do not second guess the court's credibility calls or reweigh the evidence. (In re Casey D. (1999) 70 Cal.App.4th 38, 52-53, 82 Cal.Rptr.2d 426.) Moreover, Alice's living arrangement was not suitable for three children, and she had significant health and financial issues that cast doubt upon her ability to care for them.

C. Alice Has Not Established Ineffective Assistance of Counsel

Alice contends her trial counsel was ineffective for failing to challenge the court's dispositional orders on the ground that the court did not order reunification services for her.
In order to sustain her claim of ineffective assistance of counsel, Alice must show that her trial counsel's performance fell below the standard of reasonableness and that there is a reasonable probability that the result would have been more favorable if counsel had provided adequate representation. (Strickland v. Washington (1984) 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; People v. Bolin (1998) 18 Cal.4th 297, 333, 75 Cal.Rptr.2d 412, 956 P.2d 374.) Alice must also show that counsel's omissions were not the result of a reasonable tactical decision. (People v. Gurule (2002) 28 Cal.4th 557, 611, 123 Cal.Rptr.2d 345, 51 P.3d 224.)
To the extent that we have found the trial court properly followed the statutory scheme in terminating Alice's guardianship after it was belatedly disclosed, Alice has failed to make a prima facie showing of ineffective assistance of counsel. "[C]ounsel is not required to make futile motions or to indulge in idle acts to appear competent." (People v. Torrez (1995) 31 Cal.App.4th 1084, 1091, 37 Cal. Rptr.2d 712.)
Moreover, even if we were to find counsel's omission was not reasonable, we must affirm because the record does not affirmatively establish the absence of a tactical reason for the omission. When a claim of ineffectiveness of counsel is raised on appeal, we examine the record to determine if there is any explanation for the challenged aspects of representation. If the record sheds no light on why counsel failed to act in the manner challenged, the case is affirmed "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. . . ." (People v. Pope (1979) 23 Cal.3d 412, 426, 152 Cal. Rptr. 732, 590 P.2d 859; see also In re Darlice C. (2003) 105 Cal.App.4th 459, 463, *505 129 Cal.Rptr.2d 472 [generally the proper way to raise claim is by habeas corpus writ, not by appeal].)
"We cannot assume that the decision was the result of negligence, when it could well have been based upon some practical or tactical decision governed by client guidance." (In re Arturo A. (1992) 8 Cal. App.4th 229, 243, 10 Cal.Rptr.2d 131.)
In this case, the record indicates there may have been tactical reasons for Alice's counsel's approach of defending against termination of the guardianship and not seeking reunification services. For example, the record indicates that counsel may have decided not to pursue reunification services for Alice because Alice had earlier told a social worker she could not handle the children.
Reviewing courts will sustain ineffective assistance of counsel claims on appeal "`. . . only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' [Citation.]" (People v. Zapien (1993) 4 Cal.4th 929, 980, 17 Cal.Rptr.2d 122, 846 P.2d 704.) On this record, we cannot reach this conclusion.

D. The Court Did Not Abuse Its Discretion in Denying Alice De Facto Parent Status

Alice contends the juvenile court abused its discretion in denying her application for de facto parent status.[7]
A de facto parent is "a person who has been found by the court to have assumed, on a day-to-day basis, the role of a parent, fulfilling the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." (Rule 1401(a)(8); see also In re B.G. (1974) 11 Cal.3d 679, 692, fn. 18, 114 Cal.Rptr. 444, 523 P.2d 244.) De facto parent status gives the child's present or previous caretaker standing to participate as a party in disposition hearings and subsequent hearings in which the status of the dependent child is at issue. (Rule 1412(e).) A de facto parent has the right to be present at the hearing, be represented by retained counsel,[8] and present evidence. (Ibid.) The purpose of conferring de facto parent status is to "ensure that all legitimate views, evidence and interests are considered in dispositional proceedings involving a dependent minor." (In re Kieshia E. (1993) 6 Cal.4th 68, 76, 23 Cal.Rptr.2d 775, 859 P.2d 1290.)
Whether a person should be accorded de facto parent status depends on an assessment of the particular individual and the facts of the case. (In re Patricia L. (1992) 9 Cal.App.4th 61, 66-67, 11 Cal.Rptr.2d 631.) The court should consider the applicant's adherence to the role of a parent and whether he or she has information that would be helpful to the court in making its placement orders. (In re Leticia S. (2001) 92 Cal.App.4th 378, 383, fn. 5, 111 Cal.Rptr.2d 810.) Factors the court should consider in assessing a de *506 facto parent application are whether: "(1) the child is `psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to-day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult." (In re Patricia L., supra, 9 Cal.App.4th at pp. 66-67, 11 Cal.Rptr.2d 631; In re Leticia S., supra, 92 Cal. App.4th at p. 383, fn. 4, 111 Cal.Rptr.2d 810.)
An applicant who otherwise qualifies as a de facto parent may be denied that status by acting in a manner fundamentally inconsistent with the role of a parent. (See In re Kieshia E., supra, 6 Cal.4th at p. 78, 23 Cal.Rptr.2d 775, 859 P.2d 1290.) An applicant who substantially harms a child, causing that child's dependency, is automatically disqualified. (Id. at pp. 77-78, 23 Cal.Rptr.2d 775, 859 P.2d 1290.) We review the juvenile court's findings for abuse of discretion. (In re Leticia S., supra, 92 Cal.App.4th at p. 381, 111 Cal.Rptr.2d 810.)
It was uncontested that Alice assumed the daily role of parent for the two-year-old twins since their birth and that she assumed the role of James's parent for six of his 12 years. It is not disputed that the children were psychologically bonded to Alice. Further, Alice had special knowledge of the children's health issues, regularly attended the dependency hearings after the court's jurisdiction was established, and faced losing further contact with the children as a result of a future hearing.
Notwithstanding these factors that favor granting Alice de facto parent status, Alice at least indirectly caused the twins to be at risk of substantial harm, which led to their dependency. Regardless of Alice's protestations to the contrary, she left the twins in the care of Rebecca, whom she knew used drugs and had an unstable lifestyle. As a result, the twins were found wandering outside in January 2003, in their dirty diapers and tested positive for methamphetamine and marijuana.
"[W]hen a nonparent caretaker commits `a substantial harm' to the child, a harm that is fundamentally at odds with the role of a parent, that person's protectible interest in dispositional decisions is extinguished, including whatever rights [she] might otherwise have had to de facto parent status." (In re Vincent C. (1997) 53 Cal.App.4th 1347, 1356-1357, 62 Cal. Rptr.2d 224, quoting In re Kieshia E., supra, 6 Cal.4th at p. 78, 23 Cal.Rptr.2d 775, 859 P.2d 1290.) Alice argues that her actions were, at most, neglectful and that the harm caused to the twins cannot be likened to the sexual abuse of the child by the applicant in In re Kieshia E., supra, 6 Cal.4th at pages 71-73, 23 Cal.Rptr.2d 775, 859 P.2d 1290; the abduction of the child by the applicant to enable the abusive father to have contact with him in In re Michael R. (1998) 67 Cal.App.4th 150, 153-154, 78 Cal.Rptr.2d 842; or the drug use by the applicant in In re Leticia S., supra, 92 Cal.App.4th at pages 380-381, 111 Cal. Rptr.2d 810. We do not read In re Kieshia E., supra, 6 Cal.4th 68, 23 Cal.Rptr.2d 775, 859 P.2d 1290, as being limited to sexual or physical abuse cases. Rather, the case stands for the principle that an applicant's misconduct is relevant in determining de facto parent status to the extent the misconduct caused the child's dependency. (Id. at p. 78, 23 Cal.Rptr.2d 775, 859 P.2d 1290.)
Although the facts of this case are not as serious as those in In re Kieshia E., supra, 6 Cal.4th 68, 23 Cal.Rptr.2d 775, 859 P.2d *507 1290, In re Michael R., supra, 67 Cal. App.4th 150, 78 Cal.Rptr.2d 842 or In re Leticia S., supra, 92 Cal.App.4th 378, 111 Cal.Rptr.2d 810, we cannot minimize the significance of the issues presented. Alice was aware that Rebecca used drugs, that she was irresponsible and that she was often homeless. Nonetheless, Alice allowed Rebecca to assume temporary care of the two-year-old twins. The potential for substantial harm to the twins was considerable. Further, the court found Alice's testimony less than truthful. Under these circumstances, we cannot say the court abused it discretion in denying Alice de facto parent status in the twins' cases.
James's case is a closer one. We acknowledge that all the factors supporting de facto parent status for Alice in the twins' case are stronger in James's case. Alice had assumed the day-to-day role of a parent for James for at least six years roughly half of James's life. Because Alice was James's primary caretaker, she had a unique perspective on his upbringing and his psychological makeup. She showed continuing interest in him throughout these proceedings. It was Alice's concern about James's foster home placement that led her to write to the court.
We also recognize that there was a greater risk of substantial harm to the twins than to James because of the significant difference in their ages. Nonetheless, Alice's action in allowing Rebecca to temporarily care for the children presented a significant risk to all three children. James was left unsupervised for extended periods of time. He was seen at his school at odd hours, and also was seen on the roof of the school cafeteria. In effect, James, then 12 years old, was without any guidance or supervision except during the time he was in school, and his school attendance was inconsistent. Leaving a 12-year-old child without a caretaker under these circumstances placed him at a substantial risk of harm. The court did not abuse its discretion by denying Alice de facto parent status in James's case.[9]

DISPOSITION
The orders terminating Alice's guardianship and denying Alice's de facto parent application in the twins' cases and in James's case are affirmed. The appeal of the ICWA finding in James's case is dismissed as moot.
The orders finding that ICWA did not apply in the twins' cases is reversed, and the matter is remanded with directions that the juvenile court (1) order Agency to notice all pertinent Indian tribes and the BIA, and file the required service documentation and responses, if any, from the tribes and the BIA; and (2) determine whether the notices were adequate and proper under ICWA and In re Karla C., supra, 113 Cal.App.4th 166, 6 Cal.Rptr.3d 205. Further, the court is to do one of the following: (1) if the notices are sufficient, order that ICWA does not apply, based on either the responses from the noticed tribes and the BIA that the children are not Indian children under ICWA, or the lack of responses from the tribes and the BIA; (2) if the notices are insufficient, order Agency to send new notices to the required tribes and the BIA, and file *508 copies of the notices with supporting service documentation and responses, if any, with the court or, (3) if upon proper notice of any of the noticed tribes or the BIA determines the children are Indian children under ICWA, conduct the detention, disposition and all subsequent hearings in accordance with ICWA.
The stay issued during the pendency of this appeal will be vacated when the opinion is final as to this court.
WE CONCUR: HUFFMAN, P.J., and O'ROURKE, J.
NOTES
[*] Kennard, J., dissented.
[1] All statutory references are to the Welfare & Institutions Code unless otherwise specified.
[2] All rule references are to the California Rules of Court.
[3] In this regard, we have augmented the record on appeal to include an addendum report filed below by the social worker in Merrick's dependency case and an addendum report filed by the social worker in James's case. (Rule 12(a).) Additionally, we augmented the record on appeal to include the June 7, 2004 court minutes in Merrick's case and the July 21, 2004 court minutes in James's case.

The augmentation to include these materials, which postdate the appealed orders, is not in conflict with the general rule articulated in In re Zeth S. (2003) 31 Cal.4th 396, 400, 2 Cal.Rptr.3d 683, 73 P.3d 541 barring a reviewing court from considering post-judgment evidence because here the parties have agreed to the augmentation. (Id. at pp. 413-414, fn. 11, 2 Cal.Rptr.3d 683, 73 P.3d 541; see also In re Elise K. (1982) 33 Cal.3d 138, 139, 187 Cal.Rptr. 483, 654 P.2d 253 [parties offered stipulation].)
We note the documents show that (1) in May 2004 the social worker in the twins' cases sent notices to the Yaqui Tribe and the BIA, (2) in May 2004, the social worker in James's case, who had information of possible Apache heritage, noticed the BIA, the Yaqui Tribe and 11 Apache tribes, (3) in the twins' cases, the court delayed deciding the applicability of ICWA, pending further responses from the tribes and has taken no further action because of our stay in those cases, and (4) seven weeks later in James's case, in which there was no stay, the court, after reviewing notices sent to the BIA and 12 Indian tribes, found ICWA did not apply. The court's action in James's case renders Alice's challenge of the ICWA order moot as to James.
[4] The minute order for the September 18 hearing reads in part: "The parties are further advised that a petition for extraordinary writ review must be filed in order to preserve any right to appeal the findings and orders made by the court in setting a hearing pursuant to section 366.26 of the Welfare and Institutions Code."
[5] This includes Alice's challenge of the court's order denying de facto parent status.
[6] Section 728, subdivision (a) provides in pertinent part: "The juvenile court may terminate ... a guardianship of the person of a minor previously established under the Probate Code ... if the minor is the subject of a petition filed under Section 300, 601, or 602.... The hearing on the motion may be held simultaneously with any regularly scheduled hearing held in proceedings to declare the minor a dependent child or ward of the court, or at any subsequent hearing concerning the dependent child or ward. . . ."
[7] The orders denying Alice de facto parent status were made during the hearing at which the section 366.26 hearing for the twins was set. Therefore, Alice could not under ordinary circumstances challenge the orders relating to the twins by appeal. However, as discussed above, Alice was not given proper notice of the requirement to file a petition for extraordinary writ to challenge these orders and, therefore, she is relieved of the writ requirement. (See fn. 5 and accompanying text, ante.) The order setting James's section 366.26 hearing was set at a different hearing and, therefore, Alice properly raises the denial of her de facto parent application for James by appeal.
[8] The juvenile court has the discretion to appoint counsel for a de facto parent. (Rule 1412(e)(2).)
[9] In a letter brief filed by James's appellate counsel, counsel has informed the court that James, now 13 years old, wants to live with Alice. We have not considered this information in light of In re Zeth S., supra, 31 Cal.4th at page 400, 2 Cal.Rptr.3d 683, 73 P.3d 541, which held a reviewing court generally may not "receive and consider postjudgment evidence ... rely on such evidence outside the record on appeal...." However, counsel for James can introduce evidence of James's preference before the juvenile case in James's ongoing dependency case.