Filed 8/5/22  In re I.T. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re I.T., a Person Coming Under the Juvenile Court Law. | B316344 (Los Angeles County Super. Ct. No. 18CCJP02535) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE T., Defendant and Appellant. | |

APPEAL from an order terminating parental rights of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge. Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Marissa Coffey, under appointment by the Court of Appeal, for Respondent.

Dawyn R. Harrison, Acting County Counsel and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

Father Jose T. challenges the termination of his parental rights over I.T., then 16 years old, and requests that this court reverse the order terminating parental rights. The dispositive issue on appeal is whether this court can consider events occurring after the juvenile court issued its order terminating parental rights. All parties agree that the prospective adoptive placement identified at the time parental rights were terminated subsequently failed. We conclude that, under controlling Supreme Court authority, we cannot consider events occurring after the termination of father's parental rights. Because substantial evidence supported the juvenile court's finding that I.T. was adoptable at the time the juvenile court made that finding, we affirm the order terminating father's parental rights. The dependency statutory scheme, however, allows I.T., but not father, to petition the juvenile court to modify the order terminating parental rights, if I.T. elects to do so.

## BACKGROUND

I.T. was born in May 2005. Father is I.T.'s presumed father. Mother and father divorced in 2014.[1] In April 2018, at the time the dependency proceedings commenced, I.T. lived with mother, and father lived in Florida. Mother reported that father moved to Florida after she obtained a restraining order. In April 2018, father reported that he had no information concerning I.T.'s wellbeing.

As later sustained following mother's and father's no contest pleas, the petition alleged mother has mental and emotional problems rendering her incapable of providing I.T. with regular care and supervision. Twice mother was hospitalized and mother failed to participate in psychiatric services or take prescribed medication. Father knew of mother's mental and emotional problems and was unable to protect I.T.

After the juvenile court sustained jurisdiction, the court ordered conjoint counseling with father when I.T.'s therapist deemed it appropriate and permitted father monitored visits twice a month. The court also ordered father participate in a program with the National Alliance on Mental Illness (NAMI) and parenting classes. In May 2018, father attempted to enroll in a program, but it was full and father indicated he would enroll at a later date. In June 2018, father did not have time to enroll in a parenting class because of his work and school schedule. Father was unable to travel to Los Angeles and requested phone calls instead of visits. In November 2018, father enrolled in a parenting program. In a report filed February 2019, DCFS

---

[1] Mother suffers from major depression with psychotic features and is not a party to this appeal.

indicated father started a NAMI program. In May 2019, DCFS reported that father attended five sessions of a NAMI program. In October 2019, DCFS reported that father completed his parenting program.

Social workers described I.T. as suffering from chronic posttraumatic stress disorder, major depressive disorder, and generalized anxiety disorder. I.T.'s therapist reported that I.T. was addressing these issues, made progress, and had no behavioral issues. I.T. was in psychiatric care for the posttraumatic stress disorder and took medication daily. I.T. reported that the medication did not cause him side effects. Social workers also described I.T. as "a very bright and talented artist who loves to draw." In May 2019, DCFS reported that I.T. was doing well academically and was timely completing homework. I.T. had an individualized educational plan to address emotional disturbance.

I.T. was born female and identifies as male. The juvenile court ordered I.T. receive all medical treatments including testosterone therapy. During the dependency proceedings, I.T. was transitioning from female to male. I.T. describes himself as "assigned female at birth" and having "gender nonconformity since childhood."

Although father denied it, there was evidence he abused I.T. when I.T. was a child. In 2017, mother and I.T. reported father physically abused I.T. In May 2018, I.T. reported, " 'I don't want to see or live with my dad. He is evil.' " I.T. reported father withheld food, locked him in a room, and threw him against a

wall.[2]  I.T. also described father as hitting his head with books and dragging him by his hair.

In June 2018, I.T.'s therapist did not recommend conjoint counseling with father because I.T. did not want to have any communication with father.  In June 2018, DCFS reported that I.T. refused to have any contact with father.  When father attempted to call, I.T. refused to speak to him.  In November 2018, I.T. still wanted no contact with father.

In a report filed in February 2019, DCFS indicated that I.T. started to have contact with father.  In May 2019, DCFS reported that father and I.T. had weekly calls.  In October 2019, I.T.'s therapist reported that the conjoint therapy sessions with father were problematic because father "appears very distracted and disengaged during the sessions and father is usually in a classroom or in a cafeteria where there is a lot of background noise or father is continuously speaking to other people and causing a lot of interruptions to the sessions."  Father had an interruption in every session, and I.T. was not interested in continuing with the conjoint counseling.  I.T. no longer wanted to speak to father on the phone.  I.T. said he "would die if he was forced to go live with father."

At the beginning of the dependency proceedings and for a substantial time period, I.T. lived with the F.'s, family friends. I.T. thrived in their care and they provided a supportive home but did not want to adopt I.T.  In July 2021, I.T. began living with his prospective adoptive parents Mr. and Mrs. M.

---

[2]  I.T.'s adult half sister also reported being afraid of father. I.T.'s half sister observed father drag I.T. by his hair up the stairs and kick mother's throat.

1. ***Welfare and Institutions Code[3] section 366.26 reports***

Section 366.26 governs the selection and implementation of a permanent plan for a child unable to reunify with his or her parents. The section 366.26 hearing was continued several times, and DCFS filed multiple reports in advance of the hearing.

In March 2020, in advance of the originally scheduled section 366.26 hearing, DCFS reported I.T. continued to reside with the F.'s. I.T. refused to speak to father, who called every other week. DCFS reported no prospective adoptive parent had been identified.

In January 2021, DCFS reported that I.T. looked forward to college, enjoys art and marine biology, and volunteered in an aquarium. I.T. did not want contact with father, who attempted to contact I.T. about every other week. DCFS reported that long term foster care "would probably be in the best interest for" I.T.

In a section 366.26 report dated January 2021, DCFS reported that I.T. was a bright and talented artist. I.T. refused to speak to father and "does not want to have anything to do with him." At that time, DCFS had not found a prospective adoptive family for I.T.

In July 2021, I.T. met with prospective adoptive parents, the M.'s, and reported liking them. I.T. and the M.'s were building a bond and looked forward to adoption. DCFS stated I.T. "has shown tremendous growth as an individual and has been able to open up to prospective adoptive parents. . . . He has been able to be resilient . . . ." DCFS recommended adoption as I.T.'s permanent plan.

---

[3] Undesignated statutory citations are to the Welfare and Institutions Code.

In a third section 366.26 report dated October 2021, DCFS reported I.T. was living with prospective adoptive parents Mr. and Mrs. M. Mr. and Ms. M. provided for I.T. and were supportive of his future plans. DCFS reported that Mr. and Mrs. M. provided I.T. with basic necessities and respond to his medical, emotional, and educational needs. I.T. wanted Mr. and Mrs. M. to adopt him. I.T. wanted no contact with father.

In an addendum report, DCFS reported that Mr. and Mrs. M. received certification from the resource family approval program. DCFS indicated that it had not completed an in-person visit with the prospective adoptive parents because when a social worker called to schedule a visit, Mrs. M. was expecting to give birth imminently and was unable to accommodate the requested visit.

Following a hearing at which no person testified, the juvenile court found by clear and convincing evidence that I.T. was adoptable. The court rejected father's counsel's argument that DCFS had "not done the home visits yet, and I don't see any where [*sic*] D.C.F.S. has filed a supplemental 26 indicating they have the face-to-face visits at the prospective adoptive home." At the hearing, the juvenile court stated that I.T. could not be returned to mother or father's custody and no exception to termination of parental rights applied in this case. On November 15, 2021, the court terminated mother and father's parental rights. Later that day, father filed a timely notice of appeal.

**2.** *Events subsequent* to *the termination of parental rights[4]*

In December 2021, DCFS reported that I.T. continued to live with Mr. and Mrs. M. I.T. did "not feel like 'part of the family' and spen[t] a majority of his time in his bedroom playing video games and interacting with his friends online." I.T. was not sure he wanted to be adopted by Mr. and Mrs. M. In January 2022, Mr. and Mrs. M. indicated they no longer wanted to adopt I.T. I.T. no longer wanted to live with Mr. and Mrs. M. DCFS had not identified a new prospective adoptive home for him.

## DISCUSSION

Father argues we must reverse the order terminating his parental rights; DCFS filed a letter indicating it did not oppose reversal of the order terminating parental rights. I.T. filed a respondent's brief requesting this court affirm the order terminating parental rights. We agree with I.T. because substantial evidence supported the juvenile court's order and because under controlling Supreme Court authority, we may not consider postjudgment evidence in deciding this appeal on its merits.

---

[4] We provisionally granted father's request to take judicial notice of documents evidencing these subsequent events.

## A. The Evidence at the Time of the Permanency Planning Hearing Supported Adoption as I.T.'s Permanent Plan

" ' "At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . The permanent plan preferred by the Legislature is adoption." ' [Citation.] 'In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated.' [Citations.]" (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408 (*Brandon T.*).)

"Usually, the issue of adoptability focuses on the minor, 'e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.' [Citation.] However, 'in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child.' [Citation.]" (*Brandon T.*, *supra*, 164 Cal.App.4th at p. 1408.) A finding of adoptability is supported by clear and convincing evidence, when a child is deemed adoptable because a particular care taker is willing to adopt and there is no legal impediment to the prospective adoptive parent's adoption or the prospective adoptive parents' ability to meet the needs of the child. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80 (*Helen W.*).)

In general, this court reviews the correctness of the juvenile court's order terminating parental rights at the time it was made. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 (*Zeth S.*).) Mindful of

9

the clear and convincing evidence standard in the juvenile court, substantial evidence supported the finding that I.T. was adoptable at the time the juvenile court made that finding. (*Guardianship of O.B.* (2020) 9 Cal.5th 989, 1005 ["when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"].)

At the time of the section 366.26 hearing, I.T. was placed in a prospective adoptive home. I.T. was likely to be adopted because a prospective adoptive family was identified who wanted to adopt I.T., and I.T. wanted to be adopted by them. The juvenile court was required to consider I.T.'s wishes, and at the relevant time, he unequivocally wanted Mr. and Mrs. M. to adopt him. (§ 366.26, subd. (h)(1) ["the court shall consider the wishes of the child and shall act in the best interests of the child"].) The foregoing constitutes substantial evidence that I.T. was adoptable. (*In re Mary C.* (2020) 48 Cal.App.5th 793, 803 (*Mary C.*) [usually fact that prospective adoptive parent wants to adopt child is evidence of adoptability]; *Helen W., supra*, 150 Cal.App.4th at p. 80 ["a prospective adoptive parent serves as evidence a child is likely to be adopted within a reasonable time either by the prospective adoptive parent or some other home"].) "The court was not required to find [I.T.] 'generally' or 'specifically' adoptable. [Citation.] It was required only to find by clear and convincing evidence that [I.T. was] 'likely' to be adopted within a reasonable time [citations] . . . ." (*Mary C., supra*, 48 Cal.App.5th at p. 802, fn. omitted.)

10

To the extent father seeks reversal of the order terminating parental rights on the newly-minted argument that the October 2021 section 366.26 report lacked all required information, he forfeited his claim by failing to assert any such defect[5] in the juvenile court. (*Mary C.*, *supra*, 48 Cal.App.5th at

[5] Section 366.21, subdivision (i) provides in part: "(i)(1) Whenever a court orders that a hearing pursuant to Section 366.26, including, when, in consultation with the child's tribe, tribal customary adoption is recommended, shall be held, it shall direct the agency supervising the child and the county adoption agency, or the State Department of Social Services when it is acting as an adoption agency, to prepare an assessment that shall include:

"(A) Current search efforts for an absent parent or parents or legal guardians.

"(B) A review of the amount of and nature of any contact between the child and his or her parents or legal guardians and other members of his or her extended family since the time of placement. Although the extended family of each child shall be reviewed on a case-by-case basis, 'extended family' for the purpose of this subparagraph shall include, but not be limited to, the child's siblings, grandparents, aunts, and uncles.

"(C) (i) An evaluation of the child's medical, developmental, scholastic, mental, and emotional status.

"(ii) The evaluation pursuant to clause (i) shall include, but is not limited to, providing a copy of the complete health and education summary as required under Section 16010, including the name and contact information of the person or persons currently holding the right to make educational decisions for the child.

"(iii) In instances where it is determined that disclosure pursuant to clause (ii) of the contact information

11

of the person or persons currently holding the right to make educational decisions for the child poses a threat to the health and safety of that individual or those individuals, that contact information shall be redacted or withheld from the evaluation.

"(D)  A preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian, including the prospective tribal customary adoptive parent, particularly the caretaker, to include a social history including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship.  If a proposed guardian is a relative of the minor, the assessment shall also consider, but need not be limited to, all of the factors specified in subdivision (a) of Section 361.3 and in Section 361.4.

"(E)  The relationship of the child to any identified prospective adoptive parent or legal guardian, the duration and character of the relationship, the degree of attachment of the child to the prospective relative guardian or adoptive parent, the relative's or adoptive parent's strong commitment to caring permanently for the child, the motivation for seeking adoption or guardianship, a statement from the child concerning placement and the adoption or guardianship, and whether the child, if over 12 years of age, has been consulted about the proposed relative guardianship arrangements, unless the child's age or physical, emotional, or other condition precludes his or her meaningful response, and if so, a description of the condition.

"(F)  A description of efforts to be made to identify a prospective adoptive parent or legal guardian, including, but not limited to, child-specific recruitment and listing on an adoption exchange within the state or out of the state.

12

p. 801; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411–413.) Although, in theory, a deficiency in DCFS's reporting potentially could undermine a finding of substantial evidence to support adoptability (*In re Brian P.* (2002) 99 Cal.App.4th 616, 622–623), that did not occur in this case. On appeal, father identifies *no evidence at the time of the permanency planning hearing*, that was concealed or unreported that would have supported the conclusion that I.T. was not adoptable. Even assuming DCFS should have provided additional details about I.T.'s prospective adoptive family in the section 366.26 report, substantial evidence supported the adoptability finding. (*Brandon T.*, *supra*, 164 Cal.App.4th at p. 1410 ["[W]here there is no evidence of any specific legal impediments to completing the adoption process, parental rights may be terminated to a specifically adoptable child regardless of whether a home study has been completed."].)

Father's argument that the juvenile court misunderstood the law because, at the section 366.26 hearing, the court indicated I.T. could not be returned to parents' custody lacks merit. Our Supreme Court recently held that in the context of considering the parental-benefit exception to the termination of parental rights, a juvenile court cannot rely exclusively on the fact that the child cannot be returned to parental custody. (*In re Caden C.* (2021) 11 Cal.5th 614, 630, 637.) In contrast to *Caden C.*, this appeal does not involve a challenge to the court's denial of the parental-benefit exception simply because a child could not be returned to the parents' care. The record does not support father's argument that the juvenile court relied on an improper

---

"(G) An analysis of the likelihood that the child will be adopted if parental rights are terminated."

factor when it considered adoptability. To the contrary, the record indicates the juvenile court rejected father's *only* argument that social workers "have not done the home visits yet . . . ."**6**

Notwithstanding his arguments, father essentially concedes that based on the available evidence *at the time of the permanency planning hearing,* the juvenile court properly terminated his parental rights. Father expressly acknowledges: "father did not challenge I.'s adoptability in the juvenile court directly ([citation]); because I. was in a preadoptive placement, there was little or no legal basis to do so." We agree father did not challenge I.T.'s adoptability in the juvenile court and, at the relevant time, there was no basis for any such challenge because I.T. was placed in a home with prospective adoptive parents and he wanted to be adopted by them.

## B. Father Does Not Show This Court May Consider Events Occurring After the Termination of Parental Rights

Father also argues that this court may reverse the order terminating parental rights based on events occurring after the order terminating rights. Father's argument is inconsistent with our high court's jurisprudence.

In a now disapproved case, *In re Jayson T.* (2002) 97 Cal.App.4th 75, our sister court considered evidence subsequent to the termination of parental rights that an adoption fell through and, on that basis, reversed an order terminating

---

**6** Father also incorrectly states that his counsel requested a continuance to allow social workers to visit the home. Counsel asked only that the court "note father's objection."

14

parental rights. In *Zeth S.*, the Supreme Court rejected the following rationale from *Jayson T.* (97 Cal.App.4th at p. 78): "A child should not be condemned to legal orphanage merely because possible problems with his or her adoptability were . . . not discovered or glossed over by the trial court. As long as the order terminating parental rights is not yet final, a court should be able to examine whether the child is still likely to be adopted." (*Zeth S.*, *supra*, 31 Cal.4th at p. 414, see also *ibid.* [disapproving *Jayson T.*].)

*Zeth S.* explained: "The chief problem with the Court of Appeal's approach, however well intentioned it was, is that it effectively substitutes the reviewing court's own post hoc determination of whether termination of parental rights remains in the minor's best interests for the legislatively mandated determination that follows when the comprehensive juvenile dependency statutory scheme is dutifully adhered to in the trial court. The Legislature, however, has determined that what is in the child's best interests is best realized through implementation of the procedures, presumptions, and timelines written into the dependency statutes. The statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions." (*Zeth S.*, *supra*, 31 Cal.4th at pp. 409–410, fn. omitted.)

*Zeth S.* further held that an appellate court generally cannot reverse a juvenile court's judgment when "the juvenile court itself has committed no legal error in terminating parental

rights on the record evidence before it."**7** (*Zeth S.*, *supra*, 31 Cal.4th at p. 412.) As relevant here, *Zeth S.* cautioned that "consideration of postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights, and the liberal use of such evidence to reverse juvenile court judgments and remand cases for new hearings, would violate both the generally applicable rules of appellate procedure, and the express provisions of section 366.26 which strictly circumscribe the timing and scope of review of termination orders, for the very purpose of expediting the proceedings and promoting the finality of the juvenile court's orders and judgment." (*Id.* at p. 413.)

In sum, *Zeth S.* held in the same procedural setting as here—an asserted postjudgment failure of an adoption and a valid juvenile court adoptability finding when made—that sound appellate practice and legislatively mandated goals of the dependency system counsel against allowing postjudgment evidence to upset an otherwise valid adoptability order. The concurring opinion seeks to cabin *Zeth S.'s* reach by asserting that in *Zeth S.*, the postjudgment evidence was an unsworn statement of counsel and any such evidence does not constitute "the kind of exceptional circumstances or the rare and compelling case that would warrant consideration of postjudgment evidence

---

**7** The Supreme Court subsequently described *Zeth S.* as follows: "[A]n appellate court should not consider postjudgment evidence going to the merits of an appeal and introduced for the purposes of attacking the trial court's judgment." (*In re Josiah Z.* (2005) 36 Cal.4th 664, 676.) *Josiah Z.* held that courts of appeal could consider postjudgment evidence in the context of a motion to dismiss.

16

or making factual findings by the Court of Appeal." (Conc. opn. *post*, p. 2.) As set forth above, our high court's rationale in *Zeth S.* was not based on the quality, or lack thereof, of the evidence before it.

*Zeth S.* recognized an exception not applicable to the case before us: Where all parties stipulate that postjudgment evidence showing that a child is no longer adoptable requires the reversal of an order terminating parental rights, an appellate court may accept that stipulation and reverse the order terminating parental rights. (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11, citing *In re Elise K.* (1982) 33 Cal.3d 138; see also *In re Angel L.* (2008) 159 Cal.App.4th 1127, 1141.) Clearly, where the parties stipulate that the appellate court may consider postjudgment evidence and reverse the termination of parental rights, the *Zeth S.* court's concern, that "[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination" is not implicated. (See *Zeth S.*, at p. 410.)

In *In re B.D.* (2019) 35 Cal.App.5th 803, 814 (*B.D.*), the court applied the *Zeth S.* exception to remedy a failure to provide information to the juvenile court that deprived the minor of due process. The *B.D.* court granted the mother's motion to "receive additional evidence" on appeal not presented in the juvenile court because the parties stipulated that " 'subsequent events' after the section 366.26 hearing in this case have 'undermined the juvenile court's finding that [Minor] was likely to be adopted . . . .' " (*Id.* at p. 818.) After receiving the additional evidence, the *B.D.* court held that the agency's failure to disclose that the prospective adoptive parent's history of sexual abuse or the fact that the parent's adult sons who also lived in the home had a history of

17

committing sexual offenses against other juveniles constituted a violation of due process as to the child, but not as to the parents. (*Id.* at pp. 811, 824.) The failure to provide adequate information deprived the child of the opportunity to challenge the adoptability finding. (*Id.* at p. 827.)

Here, in contrast to *B.D.*, no party stipulated to a reversal, and I.T. does not seek to challenge the juvenile court's adoptability finding. This case is further distinguishable from *B.D.* in that father identifies no critical information withheld from the parties and the court at the section 366.26 hearing, let alone any defect raising due process concerns. Instead, the events occurring after the termination order demonstrate only a change of circumstance. To reiterate, *Zeth S.* instructs that this court should not reverse a juvenile court's judgment when "the juvenile court itself has committed no legal error in terminating parental rights on the record evidence before it." (*Zeth S.*, *supra*, 31 Cal.4th at p. 412.)

Resisting this conclusion, father requests this court treat his appeal as a petition for writ of coram vobis and remand the case for a new section 366.26 hearing. Coram vobis is a "rarely invoked appellate remedy reserved for cases involving corruption of the trial court record by 'extrinsic fraud.' " (*B.D.*, *supra*, 35 Cal.App.5th at p. 814; see also *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295–1296.) Father identifies no extrinsic fraud.[8] Father shows only that circumstances changed since the

---

[8] "The extrinsic/intrinsic fraud rule is a doctrine developed in courts of equity governing the basis for successful collateral attack on a final judgment by way of an independent proceeding. The rule is that fraud internal to the adversary proceeding, such as perjury committed during trial or error or mistake during the

juvenile court terminated his parental rights. Father's premise that this court may reverse the order terminating parental rights to protect I.T. is identical to that in the now disapproved case, *In re Jayson T.*

The relevant statute governing permanency planning hearings allows I.T., not father, to petition the court to modify the order terminating parental rights.[9] It is I.T.'s choice whether to file such a petition. The Legislature did not give father the same option. Father thus has demonstrated no basis for this court to consider the evidence that the adoption fell through after the juvenile court terminated parental rights in assessing the propriety of the juvenile court's order terminating father's parental rights.

---

trial, is intrinsic and is not a basis for relief; but fraud that prevented the trial of a claim or prevented the defrauded party from getting into court at all, is extrinsic to the proceeding and is a basis for relief." (*Los Angeles Airways, Inc. v. Hughes Tool Co.* (1979) 95 Cal.App.3d 1, 7.)

[9] Section 366.26, subdivision (C)(i)(3) provides in pertinent part: "A child who has not been adopted after the passage of at least three years from the date the court terminated parental rights and for whom the court has determined that adoption is no longer the permanent plan may petition the juvenile court to reinstate parental rights pursuant to the procedure prescribed by Section 388. The child may file the petition prior to the expiration of this three-year period if the State Department of Social Services, county adoption agency, or licensed adoption agency that is responsible for custody and supervision of the child as described in subdivision (j) and the child stipulate that the child is no longer likely to be adopted. . . . If it appears that the best interests of the child may be promoted by reinstatement of parental rights, the court shall order that a hearing be held . . . ."

19

In conclusion, we recognize that I.T. desires "becom[ing] part of a loving family." I.T. has demonstrated amazing resilience. He overcame a devastating and difficult childhood where father physically abused mother and I.T., and during all this, I.T. managed a hormonal transition that by itself would be challenging even with a supportive family background. I.T. is quite remarkable. Regardless of the next steps I.T. chooses to follow, this court's obligation is to follow our Supreme Court authority (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), which requires us to affirm the order terminating parental rights notwithstanding the posttermination evidence.

## DISPOSITION

The order terminating parental rights over I.T. is affirmed. <u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

I concur:

KELLEY, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**ROTHSCHILD, P. J., Concurring.**

**I.**

I concur in the judgment affirming the order terminating parental rights. I write separately to point out that, under *In re Zeth S.* (2003) 31 Cal.4th 396 (*Zeth S.*), Courts of Appeal may consider postjudgment evidence in "rare and compelling case[s]" (*id.* at p. 399) and make factual findings when "exceptional circumstances" exist. (*Id.* at p. 405, italics omitted.) Although the application of the general rule and the exception to that rule in this case is a close question, I agree with the majority that the postjudgment evidence proffered in this case does not warrant reversal of the juvenile court's orders.

**II.**

In *Zeth S.*, the social services agency identified the child's grandfather as the child's prospective adoptive parent. At a hearing held pursuant to Welfare and Institutions Code[1] section 366.26, the juvenile court found the child adoptable and terminated the parents' parental rights. (*Zeth S., supra,* 31 Cal.4th at pp. 402−403.) After the mother appealed, her counsel filed in the Court of Appeal an unsworn letter brief stating "that '[a]ccording to the grandfather, he felt pressure to adopt [the minor] and preferred to become [the minor's] legal guardian.' " (*Id.* at p. 403.) The Court of Appeal remanded the matter to the juvenile court for "an 'updated review hearing in

---

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

the form of a retrial' " of the section 366.26 hearing. (*Zeth S.*, *supra*, at p. 404.)

In reversing the Court of Appeal, the Supreme Court held that, generally, Courts of Appeal may not "receive and consider postjudgment evidence that was never before the juvenile court, and rely on such evidence outside the record on appeal to reverse the judgment." (*Zeth S.*, *supra*, 31 Cal.4th at p. 399.) This general rule is subject to an exception for "rare and compelling case[s]." (*Ibid.*) Appellate courts are also authorized to make factual findings under Code of Civil Procedure section 909, albeit such "authority should be exercised sparingly" (*Zeth S.*, *supra*, at p. 405), and only under " 'exceptional circumstances.' " (*Ibid.*)

In *Zeth S.*, the unsworn statement submitted by appellant's counsel did not constitute "evidence" and "did not even directly relate to, much less undermine, the juvenile court's finding of the adoptability of the minor." (*Zeth S.*, *supra*, 31 Cal.4th at p. 414, fn. 11.) Thus, the facts in *Zeth S.*, did not present the kind of exceptional circumstances or the rare and compelling case that would warrant consideration of postjudgment evidence or making factual findings by the Court of Appeal.

Although *Zeth S.* explained that development of the rare and compelling case exception "must await a case in which the facts squarely present the issue" (*Zeth S.*, *supra*, 31 Cal.4th at p. 414, fn. 11), the court noted that the exception applied in *In re Elise K.* (1982) 33 Cal.3d 138. In that case, the parties stipulated that, "due to changed circumstances and the minor's advanced age, the minor in that case *was no longer adoptable . . .* , thereby undermining the foundational basis of the trial court's order terminating [the] mother's custody and control over the minor." (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11.)

2

It is not clear from *Zeth S.* and its discussion of *Elise K.* what weight, if any, a Court of Appeal should give to the fact that parties stipulate to facts that undermine the foundation of the juvenile court's order. Reason, however, suggests that where the facts undermining that foundation are indisputable, the fact that a party refuses to stipulate should not stand in the way of accomplishing justice. I would conclude, therefore, that "where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review" (*Zeth S.*, *supra*, 31 Cal.4th at p. 414, fn. 11), the power of the appellate court to consider such evidence and reverse the judgment does not depend upon the existence of a stipulation among the parties.

**III.**

In light of *Zeth S.*, the issue in cases in which a party seeks consideration of postjudgment evidence will ordinarily be, as the appellant frames the question in this case, whether the case comes within the "rare and compelling case" exception to the general rule that postjudgment evidence is not considered on appeal. I consider this to be a close question. As of May 2022, I.T. is 17 years old and the postjudgment evidence suggests that he may have difficulty bonding with any prospective parent.[2]

---

[2] In a report filed in January 2022, I.T.'s the then-prospective adoptive parents reported that I.T. "has shown a complete lack of willingness to meet very minimal responsibilities such as attending school and cleaning his room. The [former prospective adoptive parents] feel that [I.T.] believes that he is entitled to live with them on his terms—essentially that he will complete no responsibilities, but he will have unlimited gaming/electronics time and privileges. [They] express concern

3

Still, the evidence does not necessarily establish that I.T. is not adoptable. Indeed, according to a postjudgment "Last Minute Information for the Court," I.T. "stated he still wants to be adopted," and nothing in the proffered evidence indicates that social workers have determined that I.T. is no longer adoptable or that they have abandoned efforts to find a pre-adoptive placement for him. Therefore, I agree with the majority that the juvenile court's orders should be affirmed.

ROTHSCHILD, P. J.

---

that [I.T.] spends nearly all of his free time gaming or interacting with online friends and as a result, lives in an alternate reality and has very little ability to function in the real world. [I.T.] regularly resorts to dishonesty and manipulation to achieve his wants. He often feigns or grossly exaggerates physical ailments and mental health episodes in order to get out of things he does not want to do such as school and chores. He will claim that he is too physically or mentally unwell to attend school or complete a task but within minutes be fully engaged while gaming or interacting with his online friends."